**UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| UNITED STATES OF AMERICA, | ) | |
| | ) | |
| Plaintiff, | ) | No. 1:22-CR-00397-1 |
| | ) | |
| v. | ) | |
| | ) | Judge Edmond E. Chang |
| THOMAS L. GATES, | ) | |
| | ) | |
| Defendant. | ) | |

**MEMORANDUM OPINION AND ORDER**

In January 2023, a grand jury indicted Thomas Gates for, among other charges, the unlawful possession of a firearm after being convicted of a felony, in violation of 18 U.S.C. § 922(g)(1). R. 22, Superseding Indictment.[1] Now, Gates moves to dismiss the charge under Federal Rule of Civil Procedure 12(b)(1), arguing that the felon dispossession statute violates the Second Amendment, at the very least as applied to him. R. 35, Def.'s Mot. Dismiss. For the reasons discussed in this Opinion, Gates's motion to dismiss is denied.

### I. Background

On November 16, 2021, a Chicago Police Department sergeant monitoring a street-surveillance camera allegedly observed Gates display a firearm to someone, and then put the firearm down the front waistband of his pants. R. 39, U.S. Resp. at 1. Less than 10 minutes later, a police tactical team approached and detained Gates.

---

[1]Citations to the record are "R." followed by the docket entry number and, if needed, a page or paragraph number.

*Id.* The team recovered from Gates's person: a loaded semi-automatic handgun; around 45 plastic baggies containing fentanyl and cocaine; and $146 in cash. *Id.* at 1–2. Before that day, Gates had previously been convicted of state crimes, including a felony drug-delivery conviction. *Id.* at 2.

In January 2023, a grand jury returned a superseding indictment, charging Gates with unlawfully possessing a firearm after having previously been convicted of a felony, 18 U.S.C. § 922(g)(1) (Count One); possession with the intent to distribute fentanyl and cocaine base, 21 U.S.C. § 841(a)(1) (Count Two); and possession of a firearm in furtherance of a drug-trafficking crime, 18 U.S.C. § 924(c)(1)(A) (Count Three). *See* Superseding Indictment.

In August 2023, Gates moved to dismiss Count One of the Indictment—the felon-in-possession charge—on Second Amendment grounds. *See* Def.'s Mot. Dismiss. Gates argues that, as applied to the facts of this case, the statute is unconstitutional under *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 142 S. Ct. 2111 (2022). *Id.* at 1, 11. Not surprisingly, the government contests this motion. For the reasons discussed in this Opinion, the motion is denied.

## II. Legal Standard

Under Federal Rule of Criminal Procedure 12(b)(1), a "party may raise by pre-trial motion any defense, objection, or request that the court can determine without a trial on the merits." When considering a motion to dismiss a criminal indictment, the Court assumes that the indictment's factual allegations are true and must "view all facts in the light most favorable to the government." *United States v. Yashar*, 166

2

F.3d 873, 880 (7th Cir.1999). But another way to view Gates's legal challenge to the felon-dispossession statute is that the charge fails to adequately state an offense under Criminal Rule 12(b)(3)(B)(v), because the statute violates the Second Amendment. The Court moves on to that legal challenge.

### III. Analysis

### A. Second Amendment

Given recent developments under the Second Amendment, Gates argues that the felon-dispossession statute is unconstitutional because it violates his Second Amendment right to bear arms. The Second Amendment reads: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In *District of Columbia v. Heller*, the Supreme Court definitively held for the first time that the Second Amendment protects "the right of law-abiding, responsible citizens to use arms in defense of hearth and home." 554 U.S. 570, 635 (2008). The Court cautioned, however, that "like most rights, the right secured by the Second Amendment is not unlimited." *Heller*, 554 U.S. at 626 (cleaned up).[2] And the Court further warned that *Heller* should not be interpreted to "cast doubt on longstanding prohibitions on the possession of firearms by felons." *Id.* at 626. Nonetheless, in the years since the *Heller*

---

[2]This Opinion uses (cleaned up) to indicate that internal quotation marks, alterations, and citations have been omitted from quotations. *See* Jack Metzler, *Cleaning Up Quotations*, 18 Journal of Appellate Practice and Process 143 (2017).

decision was issued, courts continue to grapple with challenges on the constitutionality of the federal felon-dispossession statute, 18 U.S.C. § 922(g)(1).

Initially, after the Supreme Court decided *Heller*, most federal courts adopted a two-step framework to evaluate Second Amendment challenges. *See Bruen*, 142 S. Ct. at 2125. At step one, the federal courts asked whether the government could show that the regulated conduct fell outside the Second Amendment's original, historical scope; if yes, then the analysis ended there and the regulation was upheld. *Id.* at 2126. But if the historical analysis was inconclusive or suggested that the regulated conduct did have some protection under the Amendment, then the lower federal courts applied one of two levels of intensity in scrutinizing the regulation. *Id.* If the regulated conduct was at the "core" of the Amendment's protection, then courts applied strict scrutiny, requiring the government to prove that the regulation was narrowly tailored to achieving a compelling interest. *Id.* If the conduct at issue was outside the core of the Second Amendment, then the government need only show that the law survived intermediate scrutiny, that is, the regulation as substantially related to achieving an important government interest. *Id.* at 2126–27.

*Bruen* put an end to means-end scrutiny when analyzing Second Amendment challenges. *Bruen*, 142 S. Ct. at 2126–27. Instead, if "the Second Amendment's plain text covers an individual's conduct," then the conduct is presumptively protected. *Id.* at 2129–30. The government then bears the burden of "affirmatively prov[ing] that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 2126–27, 2130. As explained in

4

more detail later, under this standard, courts deciding Second Amendment challenges may conduct historical inquiries into analogous laws of the past to assess "whether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Id.* at 2133. The government need only "identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* at 2133 (emphases in original).

Since the issuance of *Bruen*, the Seventh Circuit has clarified the analysis demanded by *Bruen*'s text-and-history test in considering—but not yet deciding— whether the federal felon-dispossession statute, 18 U.S.C. § 922(g)(1), is constitutional. *See Atkinson v. Garland*, 70 F.4th 1018, 1022 (7th Cir. 2023). Atkinson had been convicted of a federal felony (mail fraud) some 24 years earlier. *Id.* at 1021. Invoking a civil cause of action under 18 U.S.C. § 925A, he challenged § 922(g)(1) as violating the Second Amendment. *Id.* at 1019, 1022. But this was all before *Bruen* was decided, so the district court dismissed the case, applying Seventh Circuit precedent which in turn had applied means-end scrutiny. *Id.* at 1022. During the case's pendency on appeal, the Supreme Court decided *Bruen*. *Id.* at 1019–20. After *Bruen*, the Seventh Circuit remanded the case back to the district court, instructing the district court to conduct a "proper, fulsome analysis of the historical tradition supporting § 922(g)(1)." *Id.* at 1022. The Seventh Circuit explained that the government's brief had provided *some* historical analysis, but "nothing close to what would satisfy the demanding standard set forth in *Bruen*." *Id.*; *but see id.* at 1038 (Wood, J., dissenting)

5

(explaining that based on the "Supreme Court's own use of history in *Bruen*, that 18 U.S.C. § 922(g)(1) is constitutional as written").

Although *Atkinson* remanded the case to the district court, the Seventh Circuit did provide guidance on both the applicable legal standard and the scope of the historical analysis. On the legal standard, *Atkinson* explained that the government could successfully defend modern-day arms regulations—especially those "unimaginable at the founding"—by analogy. *Atkinson v. Garland*, 70 F.4th at 1021. Echoing *Bruen*, the Seventh Circuit made clear that the government need not "pinpoint a dead ringer—a well-established and representative historical *analogue* will do." *Id.* (emphasis in original) (cleaned up). That said, pointing to "only a couple of isolated historical facts and incidents, offering no detail about their application and import[,]" would not suffice. *Id.* at 1022. Ultimately, the Seventh Circuit set forth five questions to "help focus the proper analysis on remand":

1. Does § 922(g)(1) address a 'general societal problem that has persisted since the 18th century?' … If this problem existed during a relevant historical period, did earlier generations address it with similar or 'materially different means?';

2. What does history tell us about disarming those convicted of crimes generally and of felonies in particular? Among other sources, the parties could look to commentary from the Founders, proposals emerging from the states' constitutional ratifying conventions, any actual practices of disarming felons or criminals more generally around the time of the Founding, and treatment of felons outside of the gun context (to the extent this treatment is probative of the Founders' views of the Second Amendment). When considering historical regulations and practices, the key question is whether those regulations and practices are comparable in substance to the restriction imposed by § 922(g)(1). To answer the question, the district court and the

6

parties should consider how the breadth, severity, and the underlying rationale of the historical examples stack up against § 922(g)(1);

3. Are there broader historical analogues to § 922(g)(1) during the periods that *Bruen* emphasized, including, but not limited to, laws disarming 'dangerous' groups other than felons? The parties should not stop at compiling lists of historical firearms regulations and practices. The proper inquiry, as we have explained, should focus on how the substance of the historical examples compares to § 922(g)(1);

4. If the district court's historical inquiry identifies analogous laws, do those laws supply enough of a historical tradition (as opposed to isolated instances of regulation) to support § 922(g)(1)? On this front, the parties should provide details about the enforcement, impact, or judicial scrutiny of these laws, to the extent possible;

5. If history supports Atkinson's call for individualized assessments or for a distinction between violent and non-violent felonies, how do we define a non-violent or a non-dangerous felony? And what evidence can a court consider in assessing whether a particular felony conviction was violent? For instance, can a court consider the felony conviction itself, the facts of the underlying crime, or sentencing enhancements? *Bruen* shows that these distinctions should also have firm historical support. *See* 142 S. Ct. at 2132–33 (explaining that the court must assess whether modern and historical regulations are 'relevantly similar,' including in terms of how and why the regulations burden gun rights).

*Id.* at 1023–24 (cleaned up). The Seventh Circuit recognized that the historical analysis to be conducted by the district court would "no doubt yield some measure of indeterminacy" and incomplete answers, but concluded that the district court—and the Seventh Circuit, eventually (and the Supreme Court, ultimately)—would "have to give the best answer available" on whether the government met its historical-tradition burden. *Id.* at 1024.

7

With these governing legal principles in place, the Court considers first whether Gates's alleged conduct is covered by the plain text of the Second Amendment. If yes, then the question is whether the government has shown that the felon dispossession statute, either facially or as applied to Gates, is consistent with "this Nation's historical tradition of firearm regulation." *Bruen*, 142 S. Ct. at 2126, 2129–30.

### B. Plain Text

Gates argues that the alleged conduct—the possession of a firearm by a person who has been convicted of a felony—is covered by the plain text of the Second Amendment, and thus is presumptively protected by the Constitution. Def.'s Mot. Dismiss at 4–8. To repeat, the Second Amendment reads, "A well regulated Militia, being necessary to the security of a free State, the right of the *people* to keep and bear Arms, shall not be infringed." U.S. Const. amend. II (emphasis added). The government contends that the Amendment's plain text does not cover Gates's conduct because Gates is allegedly not a "law-abiding" citizen, so he is not amongst the "people" entitled to bear arms. U.S. Resp. at 10–16. In support, the government argues that the Supreme Court has repeatedly referred to "law-abiding" citizens as those protected by the Second Amendment. *Id.* at 13–15. The government also points to legal disabilities imposed on felons throughout American history, including disallowing felons from voting, serving on juries, and holding elected office. *Id.* at 11–12.

There is no binding precedent on whether the Second Amendment's plain text covers the possession of firearms by felons. The Seventh Circuit in *Atkinson* did not

8

decide this issue, instead allowing the government to develop on remand its argument that the Amendment's plain text covers felons. 70 F.4th at 1024. It is true, as the government argues, that the Supreme Court in *Heller* thrice associated the right to bear arms with "law-abiding" citizens. *Heller*, 554 U.S. at 625, 635. But *Heller* decided only what it needed to decide. Each reference to "law-abiding" citizens did not constitute part of a broader *holding* that felons are categorically not amongst the "people" under the Second Amendment. *Id.* at 625 (describing *United States v. Miller*, 307 U.S. 174, 178–82 (1939), as holding that the Second Amendment does not protect firearms not typically possessed by "law-abiding citizens for lawful purposes"); *id.* at 625 (describing lack of significant prior federal regulation of firearms by "law-abiding citizens"); *id.* at 635 (describing *Heller*'s holding as protecting, at the least, the right of "law-abiding, responsible citizens" to bear arms in self-defense in the home). The same can be said for *Bruen*: the Supreme Court did refer to law-abiding citizens in discussing the coverage of the Second Amendment, *Bruen*, 142 S. Ct. at 2131, 2134, 2156, but did not outright hold that firearms possession by non-law-abiders is outside the Amendment's plain text coverage of the "people." Indeed, the Seventh Circuit explained (post-*Heller* but pre-*Bruen*) that "while some of *Heller*'s language does link Second Amendment rights with the notions of 'law-abiding citizens' and 'members of the political community,' those passages did not reflect an attempt to define the term 'people.'" *United States v. Meza-Rodriguez*, 798 F.3d 664, 669 (7th Cir. 2015) (cleaned up). The bottom line is that *Heller*'s and *Bruen*'s repeated references to "law-abiding citizens" do not establish the proposition that the Supreme Court has already

9

answered whether the Amendment's plain text covers firearms possession by felons. *Range v. Att'y Gen. United States of Am.*, 69 F.4th 96, 101–02 (3d Cir. 2023) (*en banc*); *see also United States v. Rahimi*, 61 F.4th 443, 453–454 (5th Cir.), *cert. granted*, 143 S. Ct. 2688 (2023).

So the Court must look beyond *Heller* and *Bruen* to first-interpretive principles. As noted earlier, the government relies on other legal disabilities imposed on felons to inform the meaning of "people." U.S. Resp. at 11–12. To the government's way of thinking, legal disabilities imposed on rights to serve on a jury, to vote, and to hold elected office all point toward interpreting "people" to exclude felons. But that argument proves—at the same time—both too little and too much. Too little because none of those legal impediments arise out of the Second Amendment. And too much because if it were right, then all *other* constitutional-rights provisions that use the word "people" would *categorically* remove felons outside of the protection of the pertinent right. But that is not so. For example, the Fourth Amendment protects the right of the "people" to be secure in their persons, houses, and property. U.S. Const. amend. IV. Yet felons are not categorically removed from Fourth Amendment protection. The most that can be said is that in some *settings*—not categorically—felons enjoy no or reduced Fourth Amendment protection. Prisoners have no Fourth Amendment right as to prison-cell searches, *Hudson v. Palmer*, 468 U.S. 517, 526 (1984), and that would apply to misdemeanants in prison too. in which the Context also does not provide much help in answering the plain-text question. Parolees may be subject to suspicionless searches without the government running afoul of the Fourth

10

Amendment. *Samson v. California*, 547 U.S. 843, 857 (2006). But there simply is no categorical removal of felons from Fourth Amendment protection. The same goes for the First Amendment right of the "people" to peaceably assemble. U.S. Const. amend. I. The government makes no attempt to reconcile these other usages of the term "people" as including felons. So, although the government here can point to some instances in which the term "people" does not cover felons as to some rights, there are counter-examples that drain away the persuasiveness of this context-based argument.

This is not to say that the legal disabilities to which the government cites are not relevant in evaluating a regulation under the Second Amendment. The argument might very well be informative—after getting past the threshold issue of the plain text's coverage—in deciding whether there exists a historical *analogue* for the regulation at issue. But it is to say that discerning the meaning of the Second Amendment's plain text—specifically the word "people"—finds little help from the context of other amendments. What is left—and where the analysis started too—is just the plain text of the Second Amendment, and no reason to think that the word "people" does not cover, on its face, all persons—including a person convicted of a felony.

### C. Historical Tradition

Although the Second Amendment's plain text presumptively protects firearms possession by felons, that does not end the analysis. Under *Bruen*, if the government can show that the felon dispossession statute is part of this country's historical tradition of firearm regulation, then the statute survives. 142 S. Ct. at 2126, 2130. The

Court holds that the government has made this showing, so Section 922(g)(1) does not violate the Second Amendment.

### 1. Legal Background on the Historical Analysis

In *Bruen*, the Supreme Court applied the text-and-history analysis in deciding the constitutionality of a New York law that required applicants to show "proper cause" to be issued an unrestricted license to carry a handgun in public. 142 S. Ct. at 2117, 2156. "Proper cause" meant showing a "special need for self-protection distinguishable from that of the general community." *Id.* at 2123. The plain text of the Second Amendment protected the otherwise-lawful carrying of firearms, and the Supreme Court then held that the government had failed to show the statute was consistent with this country's historical tradition of arms regulation. *Id.* at 2135, 2138. To make this determination, the Court considered, at length, historical sources, including regulations on carrying arms during our early Republic. *Id.* at 2135–36. *Bruen* ultimately reasoned that although there had been some historical regulation of the carrying of firearms in public (for example, limiting the intent for which one could carry arms), apart from a few outliers, "American governments simply have not broadly prohibited the public carry of commonly used firearms for personal defense[,]" nor have "American governments required law-abiding, responsible citizens" to show proper cause to carry arms in public. *Id.* at 2156.[3]

---

[3]Although *Bruen* invalidated New York's "may-issue" licensing regime, the Court clarified that nothing in its opinion "should be interpreted to suggest the unconstitutionality" of states' "shall-issue" licensing regimes—many of which require applicants to undergo a background check. 142 S. Ct. at 2138, n.9. The Court distinguished those regimes from New

The Supreme Court has not yet applied the historical-tradition analysis to consider the constitutionality of the federal felon-dispossession statute, 18 U.S.C. § 922(g)(1). It is true that *before* the Supreme Court decided *Bruen*, the vast majority of federal courts—including those in this District—upheld the statute as constitutional. But there is now a circuit split on § 922(g)(1)'s constitutionality. The Eighth Circuit recently upheld the statute's constitutionality, as applied to a defendant convicted of state law felonies for selling controlled substances. *See United States v. Jackson*, 69 F.4th 495, 505 (8th Cir. 2023). There, the Eighth Circuit reasoned that *Bruen* "did not disturb" the Supreme Court's prior "assurances" that *Heller* and *McDonald* did not cast doubt on felon-in-possession laws. *Id.* at 501–02. On the historical-regulation element of the *Bruen* test, the Eighth Circuit concluded that the historical record supported legislative authority "to prohibit possession of firearms by persons who have demonstrated disrespect for legal norms of society." *Id.* at 504; *see also United States v. Dunn*, 76 F.4th 1062, 1068 (8th Cir. 2023) ("Following [*Bruen*], this court concluded that the felon-in-possession statute is constitutional, and there is 'no need for felony-by-felony litigation regarding the constitutionality of § 922(g)(1)'") (quoting *Jackson*, 69 F.4th at 502).

But the Third Circuit recently held, sitting en banc, that the felon-in-possession statute is unconstitutional, as applied to the defendant in that case, whose

---

York's regime, because those licensing regimes "are designed to ensure only that those bearing arms … are, in fact 'law-abiding, responsible citizens.'" *Id.* (quoting *Heller*, 554 U.S. at 635).

previous felony was a state conviction for making a false statement on a food-stamp application. *Range*, 69 F.4th at 96, 98–99, 106; *see also United States v. Bullock*, 2023 WL 4232309, at *2 (S.D. Miss. June 28, 2023) (granting motion to dismiss a § 922(g)(1) charge, as applied, because the government "failed to establish a historical tradition supporting lifetime criminalization of [defendant's] possession of a firearm") (cleaned up). The Third Circuit enjoined the enforcement of the dispossession statute against Range because the "Government did not carry its burden of showing that our Nation's history and tradition of firearm regulation support disarming Range." *Id.* at 98, 106. In *Range*, the government relied on historical dispossession statutes based on race and religion, the historical execution of persons with felonies, and historical forfeiture laws, but the Third Circuit rejected those as analogues because they were not "relevantly similar" to the felon-in-possession statute. *Id.* at 104–05, 106. One of the dissents critiqued the majority opinion as applying the *Bruen* test too narrowly, explaining that despite *Bruen* emphasizing that there is no need to identify a "historical twin," the majority essentially demanded "a Founding-era statute that imposed the 'particular' restriction for the same length of time on the same group of people as a modern law." *Id.* at 129 (quoting *Bruen*, 142 S. Ct. at 2133) (cleaned up). In sum, there is no binding authority (and courts have diverged) on whether § 922(g)(1) is consistent with the historical tradition of arms regulation in this country.

14

## 2. Historical Analogues

## a. No Evidentiary Hearing

To answer whether felon dispossession is consistent with the historical tradition of arms regulation, it is important first to make clear what the parties have *not* argued. For its part, the government does not argue that during the Founding era—that is, when the Second Amendment was ratified—there was any substantial set of legal regulations that specifically dispossessed felons of firearms. *See* U.S. Resp. at 16–30. Indeed, Gates contends—without contradiction from the government—that at the time of the Founding and the ratification of the Second Amendment, there were no laws restricting non-violent ex-felons from possessing firearms. *See* Def.'s Mot. Dismiss at 9 (citing Conrad Kahn, *Challenging the Federal Prohibition on Gun Possession by Nonviolent Felons*, 55 S. Tex. L. Rev. 113, 127 (2013) ("the federal felon-firearm prohibition only dates back to 1938, and nonviolent felons were not prevented from possessing firearms until the enactment of the 1968 [Gun Control Act]").

Instead, the government relies on (1) firearms laws that banned certain groups of potential non-law-abiders from possessing firearms; and (2) more general laws that authorized capital punishment and estate forfeiture for felony sentences. *See* U.S. Resp. at 16–17. For Gates's part, he does not quarrel with the *accuracy* of the government's proffered historical sources. Put another way, by not otherwise refuting the particular laws, treatises, or academic articles, Gates implicitly accepts that the government has presented them accurately. So no evidentiary hearing is needed in this particular case, because Gates mounts no counterattack on the accuracy of the

15

sources. Instead, Gates argues that the historical-regulation examples unearthed by the government are inapt analogues. No witness testimony, expert or otherwise, is needed to evaluate the parties' dispute given the limitation on Gates's contention here.

### b. Analogues to Felon Dispossession

The overarching inquiry is whether felon dispossession, on the one hand, and the historical analogues cited by the government, on the other, "impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified." *Bruen*, 142 S. Ct. at 2133. It is worth emphasizing that *Bruen* requires "only that the government identify a well-established and representative historical *analogue*, not a historical *twin*." *Id.* (emphasis in original). In order words, "even if a modern-day regulation is not a dead ringer for historical precursors, it still may be analogous enough to pass constitutional muster." *Id.* That applies here.

As noted earlier, the government offers two categories of laws in support of the analogy to the modern-day felon-dispossession statute, specifically (1) firearms laws that banned certain groups of potential non-law-abiders from possessing firearms; and (2) more general laws that authorized capital punishment and estate forfeiture for felony sentences. *See* U.S. Resp. at 16–17. On the first category, as a matter of historical practice, governments did disarm those persons who were deemed to be "unvirtuous citizens." *See United States v. Yancey*, 621 F.3d 681, 684–85 (7th Cir. 2010) (per curiam) (explaining in pre-*Bruen* decision that "most scholars of the Second Amendment agree that the right to bear arms was tied to the concept of a virtuous

citizenry and that, accordingly, the government could disarm 'unvirtuous citizens.'")
(cleaned up). By the time of the Second Amendment's ratification in 1791, there al-
ready was a historical tradition of legislatures disarming persons based on the per-
ception (sometimes odious perceptions) that certain groups could not be trusted to
abide the law or sovereign. (This is in answer to *Atkinson*'s third question, which asks
whether there are broader historical analogues to, among other things, disarming
dangerous groups other than felons.).

 As a starting point, the government relies, in part, on Seventeenth Century
English law. Though "historical evidence that long predates" the Ratification "may
not illuminate the scope of the right," English law is relevant because the Second
Amendment "codified a right inherited from our English ancestors." *Bruen*, 142 S. Ct.
at 2119; *Heller*, 554 U.S. at 599. Unlike in *Bruen*, which concerned a general re-
striction on public-carry (requiring gun owners to show a special need), here the gov-
ernment's historical analogues from the Seventeenth Century are not "ambiguous at
best," *Bruen*, 142 S. Ct. at 2119—instead, the analogues evince a solid pattern of dis-
possessing groups of persons deemed to be legally disobedient (or at risk of being so),
*see, e.g.*, *Kanter v. Barr*, 919 F.3d 437 (7th Cir. 2019) (Barrett, J., dissenting) (quoting
Militia Act of 1662, 13 & 14 Car. 2, c. 3, § 13 (1662) (explaining that in 1662 England,
"officers of the Crown had the power to disarm anyone they judged to be 'dangerous
to the Peace of the Kingdom'"). In England, the government repeatedly enacted reg-
ulations aimed at disarming groups that the government deemed untrustworthy to
adhere to the rule of law. In 1689, shortly after the Glorious Revolution of 1688,

17

England passed a law disarming Catholics who refused to renounce their faith; the government here compellingly contends that this categorical dispossession stemmed from the distrust of those persons to obey English law at the time (determined during a time of Protestant rule). *See* U.S. Resp. at 18 (citing 1 W. & M., Sess. 1, c. 15, in 6 *The Statutes of the Realm* 71–73 (1688)); *see also* 1 W. & M., Sess. 2, c. 2, in 6 *The Statutes of the Realm* 143 (1688) (English Bill of Rights providing that "Protestants may have Arms for their Defence suitable to their Conditions and as allowed by Law"); *see also Range*, 69 F.4th at 120–22 (Krause, J., dissenting). And, as explained too by the government, after the English Civil War, the restored Stuart monarchs disarmed nonconformist Protestants, including many belonging to "pacifist denominations like the Quakers." *Range*, 69 F.4th at 120–21 (Krause, J., dissenting) ("Anglicans accused nonconformists of believing their faith exempted them from obedience to the law.") (collecting sources).

The government also persuasively argues that similar dispossession regulations during Colonial-Era America are relevant analogues to the modern felon-in-possession statute. That era's dispossession regulations targeted Native Americans and enslaved Black people. *See* U.S. Resp. at n.12 (collecting 17th and 18th century American laws aimed at disarming these groups); *see also Atkinson*, 70 F.4th at 1035, n.2 (Wood, J., dissenting) (collecting "laws that disarmed … members of native tribes"). Though these categorical bars on possession would, of course, be unconstitutional today (and are and were shameful), the regulations do evince a historical

tradition of categorically disarming groups—including those deemed "dangerous"—at the time of the ratification of the Bill of Rights.

There is an even more on-point analogue to § 922(g)(1): the colonies specifically disarmed persons, including "free, Christian, white men," "whom the authorities believed could not be trusted to obey the law." *Range*, 69 F.4th 96 at 122 (Krause, J., dissenting) (citing Nicholas J. Johnson et al., *Firearms Law and the Second Amendment: Regulation, Rights, and Policy* 174 (3d ed. 2022)). For instance, the government cites the Massachusetts government disarming the supporters of a preacher in the 1630s because "the authorities concluded their conduct evinced a willingness to disobey the law." U.S. Resp. at 21; *Range*, 69 F.4th at 123 (Krause, J., dissenting) (citing Edmund S. Morgan, *The Case Against Anne Hutchinson*, 10 New Eng. Q. 635, 637–38, 644, 648 (1937), among other sources). The government further analogizes § 922(g)(1) to various laws, in effect during the Revolutionary War, disarming those who failed to show loyalty or obedience to the nascent American units of government. *See, e.g.*, *The Public Records of the Colony of Connecticut From May, 1775 to June, 1776*, at 193 (1890); 4 *Journals of the Continental Congress* 1774–1789, at 205 (1906) (resolution of March 14, 1776). Indeed, at least six of the original 13 colonies enacted this type of legislation.[4] *See Jackson*, 69 F.4th at 503 ("In the era of the Revolutionary

---

[4]*See Acts of the General Assembly of the State of New-Jersey at a Session Begun on the 27th Day of August, 1776*, at 90 (1777) (1777 N.J. law); 1 *The Public Acts of the General Assembly of North Carolina* 231 (1804) (1777 N.C. law); 9 *The Statutes at Large; Being A Collection of All the Laws of Virginia* 282 (1821) (1777 Va. law); 7 *Records of the Colony of Rhode Island and Providence Plantations in New England* 567 (1862) (1776 R.I. law); 5 *The Acts and Resolves, Public and Private, of the Province of the Massachusetts Bay* 479 (1886)

War, the Continental Congress, Massachusetts, Virginia, Pennsylvania, Rhode Island, North Carolina, and New Jersey prohibited possession of firearms by people who refused to declare an oath of loyalty.").[5]

What's more, the government proffers other historical regulations showing that the Founders viewed the Second Amendment "to be compatible with broad legislative authority to disarm groups who could not be trusted to follow the law." U.S. Resp. at 24. This evidence includes Pennsylvania Antifederalists' proposed constitutional amendment explicitly recognizing that criminal activity can be grounds for disarmament. *See* 2 Bernard Schwartz, *The Bill of Rights: A Documentary History* 627, 665 (1971); *see also Medina v. Whitaker*, 913 F.3d 152, 158–59 (D.C. Cir. 2019) (explaining the proposal reflects that "criminals ... were proper subjects of disarmament"). And, at the Massachusetts convention, Samuel Adams proposed an amendment providing that the Constitution shall "never [be] construed ... to prevent the people of the United States, who are *peaceable citizens*, from keeping their own arms." Schwartz, at 675, 681, 758, 761 (emphasis added). It is true that, although the defense has not contested the accuracy of these descriptions of the proposed amendments (Gates did not file a reply brief), it could be argued they bear little weight because the adopted Second Amendment does not explicitly reference dispossession based on

---

(1776 Mass. law); 9 *The Statutes at Large of Pennsylvania from 1682 to 1801*, at 112–13 (1903) (1777 Pa. law).

[5]This analysis answers (as best as practicably can be done when the defense does not question the accuracy of the government's historical presentation) *Atkinson*'s fourth question, that is, whether the historical analogues supply enough of a historical *tradition* rather than isolated instances of regulation.

commission of a crime. But the proposals' very existence do support the proposition that it was "obvious" to the Founders that persons who committed crimes would properly be subject to disarmament laws. *See* Stephen P. Halbrook, *The Founders' Second Amendment: Origins of the Right to Bear Arms* 273 (2008) (explaining that the Founders "did not object to the lack of an explicit exclusion of criminals from the individual right to keep and bear arms" during the debates over "what became the Second Amendment," because this limitation "was understood"). Also, *Atkinson*'s Question Number 2 does guide district courts to examine the relevance of "proposals emerging from the states' constitutional ratifying conventions." *Atkinson*, 70 F.4th at 1023. All in all, the targeting of non-law-abiding persons in the Colonial Era for firearms dispossession is an apt analogy for felony dispossession in the modern era.

The second category of historical regulation offered by the government comprises the sweeping criminal punishments authorized against felons. Leading up to the Colonial Era, the law of England authorized capital punishment and estate forfeiture for felony convictions. *See* 4 William Blackstone, Commentaries on the Laws of England at 95 (1769) (defining a felony as "an offence which occasions a total forfeiture of either lands, or goods, or both, at the common law; and to which capital or other punishment may be superadded"); Stuart Banner, *The Death Penalty: An American History* 23 (2002) (describing capital punishment for felonies in the late 18th century as "the standard penalty for all serious crimes"); *An Act for the Punishment of Certain Crimes Against the United States*, 1 Stat. 112–15 (1790) (the First Congress, which proposed the Second Amendment, making various felonies, including

nonviolent felonies such as forgery, punishable by death). Indeed, the Supreme Court has recognized that, although "[n]ot all felonies were always punishable by death … Nonetheless, the link was profound." *Tennessee v. Garner*, 471 U.S. 1, 13 n.11 (1985) (citing 4 W. Blackstone, Commentaries at 98). The imposition of capital punishment or forfeiture for felonies persisted during the early Republic here in America. *See* Gov't's Resp. at 28 (collecting historical sources); *see, e.g.*, 2 *Laws of the State of New York Passed at the Sessions of the Legislature* (1785–1788), at 664–66 (1886) (1788 N.Y. law) (providing the punishment "for any second offense … committed after such first conviction" was "death" and that capital punishment be imposed for certain felonies, including counterfeiting). As a matter of logic and experience, it makes sense that these extensive and exhaustive penalties for felonies—outright capital punishment and the forfeiture of all property—qualify as powerful evidence that mere firearms dispossession of felons is a "comparable burden," as *Bruen* frames the standard, 142 S. Ct. at 2133, to historical punishments for felonies. *See Medina*, 913 F.3d at 158 (explaining the almost-inseparable historical connection between felonies and capital punishment); *see also Jackson*, 69 F.4th at 503 (noting that early legislatures "authorized punishments that subsumed disarmament—death or forfeiture of a perpetrator's entire estate—for non-violent offenses involving deceit and wrongful taking of property").

It is true that the historical regulation of non-law-abiders did not specifically target *felons*, nor did the historical authorization of capital punishment and forfeiture specifically target *firearms*. So the comparability between those regulations and felon

dispossession is far from perfect. But the government need not offer a "dead ringer." *Bruen*, 142 S. Ct. at 2133. Indeed, it is crucial to the analogical analysis that firearms technology has advanced radically since the Second Amendment's ratification in 1791. The Supreme Court in *Bruen*, and the Seventh Circuit in *Atkinson*, were both prescient in pointing out the relevance of technological advancements in firearms. In *Bruen*, the Supreme Court distinguished historical analogies that might be "relatively simple to draw" versus "other cases implicating unprecedented societal concerns or dramatic technological changes [that] may require a more nuanced approach." *Id.* at 2132. In *Atkinson*, the very first question for district courts to consider was whether § 922(g)(1) addresses a "general societal problem that has persisted since the 18th century?" 70 F.4th at 1023 (quoting *Bruen*, 142 S. Ct. at 2131). Firearms technology has advanced at a rapid pace, far outstripping the firearms-related problems that legislatures had to address in 1791. Modern firearms can fire multiple rounds without reloading, whereas most guns available in 1791 "could not fire more than one shot without being reloaded," *Friedman v. City of Highland Park, Ill.*, 784 F.3d 406, 410 (7th Cir. 2015) (upholding city ordinance prohibiting assault weapons and large-capacity magazines). Modern firearms manufacturers can produce firearms at greater volumes than those in 1791. These advancements in firearms technology—both in sheer firepower and accessibility—must be considered when deciding how close a fit the modern felon-dispossession statute must be to historical regulations that dispossessed groups of non-law-abiders (at least as perceived at the time) and that authorized broad punishment of felons (again, at least at that time).

23

Nor is the Second Amendment the only context in which developments in firearms technology is relevant to constitutional interpretation: in *Tennessee v. Garner*, the Supreme Court considered whether the Fourth Amendment authorized the use of deadly force by the police against fleeing felons. 471 U.S. at 11–12. As of 1791, the Supreme Court acknowledged, the common law rule authorized deadly force against *all* fleeing felons under *any* circumstances. *Id.* at 13–14. But in part because of technological advancement in firearms technology and accessibility—that is, "deadly force from a distance" was now possible in the modern era, when the police started to carry handguns, *id.* at 15—*Garner* held that police may use deadly force only when there is probable cause to believe that a fleeing felon poses a threat of serious physical harm either to the police officer or to others, *id.* at 11. *Garner*, and more recently *Bruen*, both acknowledge the relevance of technological changes in applying a constitutional provision to modern-day facts.

One final point is worth making in considering the relevance of modern-day firearms technology to the analogical analysis under the Second Amendment. *Bruen*, and *Heller* before it, held that the reference to "arms" in the Second Amendment refers not only to arms in existence in the 18th century. *Bruen*, 142 S. Ct. at 2132. Instead, the term "arms" also "covers modern instruments that facilitate armed self-defense." *Id.* It would be incongruous to consider the firepower and accessibility of modern-day firearms as covered by the Second Amendment when deciding how *expansive* the right to bear arms is (or is not), yet refuse to consider the firepower and accessibility of modern-day firearms when deciding the constitutionality of potential

24

*limitations* on that very same right. When those technological developments are taken into account, the government has adequately demonstrated that § 922(g)(1) "is consistent with the Nation's historical tradition of firearm regulation" and "is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Bruen*, 142 S. Ct. at 2126, 2127, 2130.

### D. The Propriety of an As Applied Challenge

Lastly, Gates argues that he is not subject to § 922(g)(1) because his felony convictions are drugs-related convictions, and none of them involve allegations of the use (or threatened use) of violent force. Def.'s Mot. Dismiss at 3. But like the defendant in *Atkinson*, Gates fails to provide "much historical basis for individualized assessments" or carveouts between "individuals who committed violent versus non-violent crimes" for § 922(g)(1) purposes. *Atkinson*, 70 F.4th at 1023.[6] To the contrary, as explained earlier, the historical analogues provided by the government support a legislative authority to disarm persons convicted of felonies, regardless of whether the conviction involved a use (or attempted use) of force. As the prior parts of this Opinion discuss, in targeting groups of persons for dispossession, the historical regulations did not parse out an individualized "dangerousness" assessment. The as-applied challenge is rejected.

---

[6] In answer (again, as best as can practicably be accomplished) to *Atkinson*'s fifth and final question, the Court concludes—absent historical evidence from the defense—that there is no basis for individualized assessments for violent versus non-violent predicate felonies.

25

## IV. Conclusion

Gates's motion to dismiss is denied. The felon firearm-dispossession statute, 18 U.S.C. § 922(g)(1), does not violate the Second Amendment.

ENTERED:


s/Edmond E. Chang
Honorable Edmond E. Chang
United States District Judge


DATE: September 6, 2023

26